IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **EDDIE J. SYKES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) CIVIL NO. 09-cv-941-MJR |
| | ) |
| **OLY OBADINA, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**MEMORANDUM AND ORDER**

**REAGAN, District Judge:**

Plaintiff Eddie J. Sykes, an inmate in the Pinckneyville Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. This case is now before the Court for a preliminary review of the complaint pursuant to 28 U.S.C. § 1915A, which provides:

> (a) **Screening.**– The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
> (b) **Grounds for Dismissal.**– On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint–
>     (1) is frivolous, malicious, or fails to state a claim on which relief may be granted; or
>     (2) seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A. An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Upon careful review of the

complaint and any supporting exhibits, the Court finds it appropriate to exercise its authority under § 1915A; portions of this action are subject to summary dismissal.

Sykes's primary theme in this action is the denial of adequate medical care for his many ailments. He also complains about conditions in his cell, use of force by officers, interference with his access to the courts, unsatisfactory responses to his grievances, threat of injury by his cellmate, and unfair disciplinary proceedings. The 46-page handwritten complaint is not separated into specific counts; instead, Sykes presents a detailed chronology of events beginning October 30, 2008, and running through October 30, 2009, the day he signed his complaint form. Below the Court will discuss the nature of each claim and examine the allegations made against each defendant associated with that claim.

## **MEDICAL CARE**

Sykes's leading medical problem is an enlarged prostate gland. He explains his symptoms in the complaint, as he did to many people at Pinckneyville,[1] as such:

> difficulty starting urination, poor flow of urine and increased frequency of urination, eventually the flow of urine may cease completely either because the urethra is completely blocked or because the cancer has spread to the bladder and ureters, in advanced cases pain my be caused by involvement of nerves within the pelvis or by spread of cancer to bones anywhere in the body. I'm throwing up my food and my bowel movement move 4 or 5 times when I eat my food. I have pain in my upper hip and thigh and the lower part of my back.

Sykes also suffers from high blood pressure and high cholesterol, for which he takes medication. He alleges that when his medication ran out, it was not refilled, leading to dizziness,

---

[1] Sykes states that he spoke with Nurse Tracy, Nurse Amy, Officer Bond, Officer Homoya, Nurse Ross, Nurse Flowers, Nurse Rogers, Nurse Melanie, and Nurse Tammy with respect to his enlarged prostate issues. He does not list these people as defendants, and the Court does not consider them parties to this action.

headache, and pain in the left side of his chest and his arm.[2]

Two other medical ailments are raised in the complaint. First, Sykes incurred an injury to his wrist due to alleged rough treatment by an officer, for which he claims he got minimal medical attention.[3] Second, Sykes claims that when he went to the barber, he contracted some sort of rash; he believes an inmate ahead of him at the barber left a residue of his infection in the chair, which then passed to Sykes when he sat in the chair.

### *Nurse Sarah Ferris*[4]

Sykes went to nurse sick call on November 12, 2008, and spoke with Ferris about his enlarged prostate. She told him that she would put him down to see the doctor on Friday.

On November 19, 2008, Sykes returned to the medical unit for lab work. When Ferris learned that he had eaten earlier that morning, she told him she would have to reschedule his appointment, as the tests could not be done if he had eaten or drank anything after midnight.

Sykes went to nurse sick call on December 14, 2008, and spoke with Sarah. He complained to her about his prostate problem, but she told him that he had not been called to the nurse appointment for that problem. Sykes persisted in his complaints, but Sarah told him that she would do nothing for him with respect to that problem, as it was already being addressed by the doctor.

Sykes saw Sarah again on April 1, 2009, and then on April 7, 2009, regarding his prostate.

---

[2] Sykes states that he spoke with Nurse Nancy, Nurse Susie, Officer Burn, and Nurse Rogers. with respect to his blood pressure and cholesterol issues. He does not list these people as defendants, and the Court does not consider them parties to this action.

[3] Sykes also mentions Lt. Robinson and Officer Harvest with respect to his injured wrist. He does not list these people as defendants, and the Court does not consider them parties to this action.

[4] In the list of defendants, Sykes identifies a Nurse Sarah Ferris (Fariss). In the body of the complaint, he makes reference to Nurse Ferris and later to Nurse Sarah. For purposes of this order, the Court will assume that this is the same person.

She told him that she and everyone else at health care was tired of him and his complaints about his enlarged prostate.

Sykes saw Sarah in the segregation unit on October 27, 2009, regarding his prostate problem. Pain medication was ordered, but the order did not get put in his file. Thus, on October 30, 2009, Sarah did not have pain medication for him on the med line. Sykes asserts that Sarah refused to give him pain medication out of retaliation.

### *Dr. Obadina*

Sykes first saw Obadina on November 18, 2008. He explained to Obadina his problems regarding his enlarged prostate, something he had suffered from since 2003. Obadina told him that he would have Sykes come to the medical unit for a more thorough examination.

Sykes had an appointment with Obadina on December 8, 2008, to discuss his prostate issues. Sykes explained in depth his symptoms and his concerns; he makes no allegations about what Obadina said or did as a result of this appointment.

On December 23, 2008, Sykes met with Obadina to discuss the lab results related to his prostate problem. Obadina told him that the tests did not show that anything was wrong, but Obadina would schedule Sykes for a consultation with a urologist.

Due to an incident on January 15, 2009, Sykes saw Obadina on February 2, 2009, regarding an injury to his left wrist and hand. Obadina saw that the hand was swollen and felt the knot on his wrist. Sykes stated that he was in pain, and Obadina told him that he would order pain medication for him. Obadina also scheduled an x-ray for his hand.

Sykes saw Obadina on July 10, 2009, regarding his prostate. Certain lab tests were pending, so Obadina postponed his examination until after the lab results were returned.

On August 6, 2009, Sykes had an appointment with Obadina. Sykes began to complain about his prostate, but Obadina told him the purpose of that visit was to check his blood pressure and cholesterol.

Sykes saw Obadina on October 27, 2009, in the segregation unit and complained about his prostate. He told Obadina that his medication had run out, and that it was not working. Obadina told him that he would have Sykes come to the medical unit for another examination. Obadina also told him that he would order pain medication for him, but that order did not get entered into his file.

### *Nurse Lane*

On November 21, 2008, Sykes gave Lane the stickers from his medication for high blood pressure and high cholesterol in order to get refills of his prescriptions. Almost two weeks went by, and Sykes did not receive his medication. He spoke with officers on the wing and other nurses (none mentioned by name) about getting his medication, and also about his dizziness and chest pain. He was told by many that they would check on his medication, but no further action was taken at that time.

### *Nurse Little*

On December 3, 2008, Sykes spoke with Little about his dizziness and chest pain. Little did not take his blood pressure at that time, nor did she have him transferred to the medical unit; she told him she would check on his medication.

On June 24, 2009, Sykes tried to speak with Little about his prostate as she was dispensing medications in the cell house.

### *Officer Flowers*

On December 5, 2008, Sykes advised Flowers that he was having chest pain, and he

explained to Flowers his history of high blood pressure and high cholesterol. Flowers contacted the medical unit and was told to put Sykes on the doctor line. Later Flowers told Sykes that the doctor would not see him until after he had the lab test results. Sykes protested, so Flowers summoned a nurse to check his condition.

On January 30, 2009,[5] Sykes told Flowers that he was having a medical emergency related to his prostate, and it was not being addressed properly by medical staff. Flowers refused to call the health care unit, and later Nurse Hill did her rounds on the wing. Sykes attempted to speak with her about his prostate problems, but Flowers told her to ignore Sykes.

### *Nurse Hill*

On December 18, 2008, Sykes went to nurse sick call and spoke with Hill about his enlarged prostate. Hill told him that the doctor had already addressed that problem, and there was nothing more that she could do for him.

On January 30, 2009 (*see* fn. 5), Hill was doing medical rounds. Sykes attempted to speak with her about his prostate problem, but Hill ignored him (as directed by Officer Flowers).

Sykes went to nurse sick call on February 17, 2009, and spoke with Hill about a new concern. Sykes told her that he was breaking out with small bumps on his head and arms. He feared that he had contracted crabs or some other infection from another inmate after sitting in the same barber chair. Hill told him he was being a pest and sent him away.

On June 25, 2009, Sykes told Hill that he was having a medical emergency with regard to his prostate. She told him that he had been seen about that problem numerous times, and they would

---

[5] The allegations involving January 30 begin at the bottom of page 30 of the complaint, then inexplicably jump to page 32. Page 31, which details events of February 2-4, appears to have been added later, inserted there to maintain the correct chronology of events.

get to him when they were ready.

### Officer Hill

On January 30, 2009 (*see* fn. 5), Sykes told Hill that he had a medical emergency, and he explained to Hill in detail his problems involving his prostate. Hill told him it was not an emergency, and referred him to Officer Flowers.

### Dr. Gary Reagan

On February 9, 2009, Sykes was taken to Mt. Vernon for a consultation with Reagan, a urologist. Reagan told Sykes that he was too young to have cancer or an enlarged prostate, and that Sykes suffered from urinary tract infection.

Sykes returned to see Reagan on March 31, 2009, presumably for surgery. Sykes was anesthetized, during which time Reagan performed a cystoscopy and found no blockage, so no surgery was performed.

### Nurse Gale

Sykes went to nurse sick call on February 13, 2009, and spoke with Gale about his prostate problems. Gale told him that she would not do anything for him and sent him away.

Sykes went to nurse sick call on September 11, 2009, and spoke with Gale about his prostate problems. She told him she would put him down to see the doctor.

### Officer Phillip

On February 28, 2009, Sykes was ill from his prostate problems, and he passed out on the floor of his cell. When Phillip did his count, he told Sykes to get up. Sykes explained that he was too sick to get off the floor, and Phillip walked away. Later that evening, Phillip returned to Sykes's cell with a nurse.

### *Nurse Blackburn*

On the evening of February 28, 2009, Blackburn visited Sykes at his cell, where he had collapsed due to problems related to his prostate. Sykes states that Blackburn did not examine him or provide him with any medical treatment.

### *Officer Bowerman*

On June 26, 2009, Sykes complained to Bowerman about his recent discussions with the medical staff regarding his prostate issues. Bowerman told him there was nothing more that he could do for Sykes.

### *Nurse Joyce*

On June 26, 2009, Joyce was dispensing medication on the wing. Sykes informed her that he was in pain due to his prostate problems.

Sykes went to nurse sick call on August 7, 2009, and spoke with Joyce about his prostate problem. Joyce told him she would put him down to see the doctor.

### *Dr. Shaffner*

Sykes saw Shaffner on September 15, 2009, as Obadina was on vacation. Sykes asked Shaffner about changing his medication for his prostate, but Shaffner said no.

## Legal Standards and Analysis

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

> A deliberate indifference claim requires both an objectively serious risk of harm and a subjectively culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A deliberate indifference claim premised upon

>inadequate medical treatment requires, to satisfy the objective element, a medical condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653. The subjective component of a deliberate indifference claim requires that the prison official knew of "a substantial risk of harm to the inmate and disregarded the risk." *Id.*; *Farmer*, 511 U.S. at 834. Mere medical malpractice or a disagreement with a doctor's medical judgment is not deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Greeno*, 414 F.3d at 653; *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). Still, a plaintiff's receipt of some medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" a medical condition. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (citation omitted).

*Edwards v. Snyder*, 478 F.3d 827, 830-31 (7th Cir. 2007).

Applying this standard to the allegations in the complaint, the Court is unable to dismiss the claims against Obadina, Nurse Sarah Ferris, and Nurse Hill at this point in the litigation. See 28 U.S.C. § 1915A. However, the Court finds that Sykes has failed to state a claim against Nurse Gale, Officer Hill, Nurse Little, Nurse Joyce, Nurse Blackburn, Officer Flowers, Officer Phillip, Officer Bowerman, Dr. Schaffner, Dr. Reagan, or Nurse Mary Lane, and these Defendants will be dismissed from this action with prejudice.

## **CELL CONDITIONS**

On November 9, 2008, Sykes complained to Officers Harvest and Shirley about the lack of heat in his cell. Later that day he made the same complaint to Officer Stanton, who told him the heat was off as a cost-saving measure.[6] On November 12, 2008, Sykes was moved to a different housing

---

[6] Harvest, Shirley and Stanton are not listed as defendants, and the Court does not consider them to be parties to this action.

unit. He complained to Defendant Redding about his dirty cell, dirty mattress, and dirty pillow, as well as the lack of heat. Redding told him there was nothing he could do about the situation.

In a case involving conditions of confinement in a prison, two elements are required to establish violations of the Eighth Amendment's cruel and unusual punishments clause. First, an objective element requires a showing that the conditions deny the inmate "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The second requirement is a subjective element – establishing a defendant's culpable state of mind. *Id.*

Applying these standards to the allegations in the complaint, the Court finds that Sykes has failed to state a claim regarding the conditions of either cell. Therefore, this claim against Redding will be dismissed from this action with prejudice.

## **EXCESSIVE FORCE**

Sykes states that on January 15, 2009, Sgt. Daniel injured his left wrist and hand when Daniels pulled it through the chuck hole, banging his wrist and hand against the edge.

The intentional use of excessive force by prison guards against an inmate without penological justification constitutes cruel and unusual punishment in violation of the Eighth Amendment and is actionable under Section 1983. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000). "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. An inmate seeking damages for the use of excessive force need not establish serious bodily injury to make a

claim, but not "every malevolent touch by a prison guard gives rise to a federal cause of action. . . . [the] prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9-10; *see also Outlaw v. Newkirk*, 259 F.3d 833, 837-38 (7th Cir. 2001).

Based on the sketchy allegations in the complaint, the Court finds that this incident is simply a de minimis use of force, and Sykes has failed to state a claim against Daniels. Therefore, this claim will be dismissed.

## ACCESS TO COURTS

With respect to his access to courts claim, Sykes makes the following specific allegations against the named defendants:

***Donna Heidemann***, the law librarian, refused to provide him with additional complaint forms or envelopes. She would not make copies for him or respond to his request for production of documents and interrogatories, and she did not notarize unspecified documents for him.

Sykes alleges that the property officer, ***Harris***, took some of his legal papers from his legal property box and threw them away.

"[T]he mere denial of access to a prison law library or to other legal materials is not itself a violation of a prisoner's rights; his right is to access *the courts*, and only if the defendants' conduct prejudices a potentially meritorious challenge to the prisoner's conviction, sentence, or conditions of confinement has this right been infringed." *Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006). A prisoner's complaint must "spell out, in minimal detail, the connection between the alleged denial of access to legal materials and an inability to pursue a legitimate challenge to a conviction,

sentence, or prison conditions." *Id.*

In this action, Sykes makes no allegation that his efforts to pursue any specific litigation was impeded. Thus, he has failed to state a claim upon which relief may be granted, and this claim will be dismissed.

## **GRIEVANCES**

Sykes filed grievances over many of his complaints, and he makes the following specific allegations against the named defendants:

***Counselor Hubbard*** refused to give him a grievance form in February 2009, so Sykes had to get one from another inmate. He complained to Hubbard about problems with his cell mate, and she told him to contact officials in Springfield. He complained to Hubbard about his medical problems, but she told him there was nothing she could do.

***Counselor Deen*** took too long to respond to his grievance about Blackburn's failure to provide him with medical treatment on February 28, 2009.

***Counselor Fritts*** told him that there was nothing she could do regarding his medical treatment, as the medical personnel told her that they were addressing his concerns.

Sykes seems to think that any prison employee who knows (or should know) about his problems has a duty to fix those problems. That theory is in direct conflict with the well-established rule that "public employees are responsible for their own misdeeds but not for anyone else's." *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009). *See also Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (doctrine of respondeat superior does not apply to § 1983 actions). As Chief Judge Easterbrook recently stated,

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way.

> Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. Burks's view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care. *See Durmer v. O'Carroll*, 991 F.2d 64 (3$^d$ Cir. 1993).

*Burks*, 555 F.3d at 595.

Furthermore, "a state's inmate grievance procedures do not give rise to a liberty interest protected by the due process clause." *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1995). The Constitution requires no procedure at all, and the failure of state prison officials to follow their own procedures does not, of itself, violate the Constitution. *Maust v. Headley,* 959 F.2d 644, 648 (7th Cir. 1992); *Shango v. Jurich*, 681 F.2d 1091 (7th Cir. 1982).

Sykes has failed to state a claim with respect to the grievance process, and this claim will be dismissed.

## **SEGREGATION**

On April 22, 2009, Sykes's cell mate harassed him because of his medical problems. Sykes complained to Officer Kelly, who told him not to make trouble, or Kelly would take him to segregation. Sykes also complained to Officer Whitehead about his cell mate's threats, so Sykes

was taken to segregation for refusing his housing assignment.[7]

Sykes states that on October 20, 2009, he was told he was going back to his old cell. Sykes protested, stating that he had filed a request for protective custody. Because he refused his housing assignment, Sykes received a disciplinary ticket for disobeying a direct order; and he was returned to segregation. Sykes wrote to Warden Schwartz to complain, but got no response.

When a plaintiff brings an action under § 1983 for procedural due process violations, he must show that the state deprived him of a constitutionally protected interest in "life, liberty, or property" without due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). An inmate has a due process liberty interest in being in the general prison population only if the conditions of his or her confinement impose "atypical and significant hardship...in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Seventh Circuit Court of Appeals has adopted an extremely stringent interpretation of *Sandin*. In this Circuit, a prisoner in disciplinary segregation at a state prison has a liberty interest in remaining in the general prison population only if the conditions under which he or she is confined are substantially more restrictive than administrative segregation at the most secure prison in that state. *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997). If the inmate is housed at the most restrictive prison in the state, he or she must show that disciplinary segregation there is substantially more restrictive than administrative segregation at that prison. *Id.* In the view of the Seventh Circuit Court of Appeals, after *Sandin* "the right to litigate disciplinary confinements has become vanishingly small." *Id.* Indeed, "when the entire sanction is confinement in disciplinary segregation for a period that does not exceed the

---

[7] Sykes also mentions Sarah Johnson, Roger Walker, S. Wallas, Lt. Robinson, Lt. Klindworth, and Officer McBride with respect to this issue. They are not listed as defendants, and the Court does not consider either of them to be a party to this action.

remaining term of the prisoner's incarceration, it is difficult to see how after *Sandin* it can be made the basis of a suit complaining about a deprivation of liberty." *Id.*

In the case currently before the Court, Sykes was sent to disciplinary segregation for several weeks. Nothing in the complaint or exhibits suggests that the conditions that he had to endure while in disciplinary segregation were substantially more restrictive than administrative segregation in the most secure prison in the State of Illinois. Therefore, his due process claim is without merit, and it will be dismissed.

## **OTHER DEFENDANTS**

In the caption of the complaint and list of defendants, Sykes names many people but makes no allegations against them in the body of the complaint. Specifically, he includes Crissy Fenton, Nurse Donna, Officer Johnson, Officer Dillie, Lt. Green, Nurse Lane, Counselor Mary Duke, Counselor Lutz, and Assistant Warden Dinetlmann.

The reason that plaintiffs, even those proceeding pro se, for whom the Court is required to liberally construe their complaints, *see Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), are required to associate specific defendants with specific claims is so these defendants are put on notice of the claims brought against them and so they can properly answer the complaint. *See Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (a "short and plain" statement of the claim suffices under Fed. R. Civ. P. 8 if it notifies the defendant of the principal events upon which the claims are based); *Brokaw v. Mercer County*, 235 F.3d 1000, 1024 (7th Cir. 2000) ("notice pleading requires the plaintiff to allege just enough to put the defendant on notice of facts providing a right to recovery"). Furthermore, merely invoking the name of a potential defendant is not sufficient to state a claim against that individual. *See Collins v. Kibort*, 143 F.3d 331, 334 (7th Cir. 1998) ("A plaintiff cannot

state a claim against a defendant by including the defendant's name in the caption."). Thus, these individuals will be dismissed from this action.

Also, to reiterate what is stated in footnotes throughout this Order, Sykes mentions many people in the text of the complaint who are not listed in the caption or list of defendants. Specifically, Sykes refers to Nurse Tracy, Nurse Amy, Officer Bond, Officer Homoya, Nurse Ross, Nurse Flowers, Nurse Rogers, Nurse Melanie, Nurse Tammy, Nurse Nancy, Nurse Susie, Officer Burn, Lt. Robinson, Officer Harvest, Officer Shirley, Officer Stanton, Sarah Johnson, Roger Walker, S. Wallas, Lt. Klindworth, and Officer McBride. The Court does not consider any of these individuals to be a party to this action.

## APPOINTMENT OF COUNSEL

Sykes also requests that the Court appoint him counsel (Doc. 3). There is no absolute right to appointment of counsel in a civil case. *Cook v. Bounds*, 518 F.2d 779 (4th Cir. 1975); *Peterson v. Nadler*, 452 F.2d 754 (8th Cir. 1971). When presented with a request to appoint counsel, the Court must make the following inquiries: "(1) has the ... plaintiff made a reasonable attempt to obtain counsel or effectively been precluded from doing so and (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself." *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007). With regard to the first step of the inquiry, there is no indication at all whether Sykes has attempted to obtain counsel or been effectively precluded from doing so. Therefore, the motion for the appointment of counsel is **DENIED**, without prejudice.

## DISPOSITION

**IT IS HEREBY ORDERED** that Defendants **CRISSY FENTON, NURSE GALE, OFFICER HILL, NURSE LITTLE, NURSE JOYCE, NURSE DONNA, NURSE**

**BLACKBURN, SGT. DANIEL, OFFICER FLOWERS, OFFICER PHILLIP, OFFICER HARRIS, OFFICER KELLY, OFFICER WHITEHEAD, OFFICER BOWERMAN, OFFICER JOHNSON, OFFICER DILLIE, LT. GREEN, NURSE LANE, COUNSELOR HUBBARD, COUNSELOR FRITTS, COUNSELOR DUKE, DR. SHAFFNER, COUNSELOR LUTZ, OFFICER DEEN, DONNA HEIDEMANN, OFFICER REDDING, DR. REAGAN, GREGORY SCHWARTZ, ASST. WARDEN DINETLMANN,** and **NURSE MARY LANE** are **DISMISSED** from this action with prejudice. Plaintiff is advised that, within the Seventh Circuit, dismissal of these claims and defendants count as a strike for purposes of § 1915(g). *See George v. Smith,* 507 F.3d 605, 607-08 (7th Cir. 2007); *Boriboune v. Berge,* 391 F.3d 852, 855 (7th Cir. 2004).

**TO CLARIFY**: the only claims remaining in this action are the medical care claims against Defendants **OBADINA, SARAH FERRIS** and **NURSE HILL**.

The Clerk is **DIRECTED** to prepare Form 1A (Notice of Lawsuit and Request for Waiver of Service of Summons) and Form 1B (Waiver of Service of Summons) for **OBADINA, SARAH FERRIS** and **NURSE HILL**. The Clerk shall forward those forms, USM-285 forms submitted by Plaintiff, and sufficient copies of the complaint to the United States Marshal for service.

The United States Marshal is **DIRECTED**, pursuant to Rule 4(c)(2) of the Federal Rules of Civil Procedure, to serve process on **OBADINA, SARAH FERRIS** and **NURSE HILL** in the manner specified by Rule 4(d)(2) of the Federal Rules of Civil Procedure. Process in this case shall consist of the complaint, applicable forms 1A and 1B, and this Memorandum and Order. For purposes of computing the passage of time under Rule 4(d)(2), the Court and all parties will compute time as of the date it is mailed by the Marshal, as noted on the USM-285 form.

With respect to former employees of Illinois Department of Corrections who no longer can be found at the work address provided by Plaintiff, the Department of Corrections shall furnish the Marshal with the Defendant's last-known address upon issuance of a court order which states that the information shall be used only for purposes of effectuating service (or for proof of service, should a dispute arise) and any documentation of the address shall be retained only by the Marshal. Address information obtained from I.D.O.C. pursuant to this order shall not be maintained in the court file, nor disclosed by the Marshal.

The United States Marshal shall file returned waivers of service as well as any requests for waivers of service that are returned as undelivered as soon as they are received. If a waiver of service is not returned by a defendant within **THIRTY (30) DAYS** from the date of mailing the request for waiver, the United States Marshal shall:

- Request that the Clerk prepare a summons for that defendant who has not yet returned a waiver of service; the Clerk shall then prepare such summons as requested.

- Personally serve process and a copy of this Order upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure and 28 U.S.C. § 566(c).

- Within ten days after personal service is effected, the United States Marshal shall file the return of service for the defendant, along with evidence of any attempts to secure a waiver of service of process and of the costs subsequently incurred in effecting service on said defendant. Said costs shall be enumerated on the USM-285 form and shall include the costs incurred by the Marshal's office for photocopying additional copies of the summons and complaint and for preparing new USM-285 forms, if required. Costs of service will be taxed against the personally served defendant in accordance with the provisions of Federal Rule of Civil Procedure 4(d)(2) unless the defendant shows good cause for such failure.

Plaintiff is **ORDERED** to serve upon defendant or, if appearance has been entered by counsel, upon that attorney, a copy of every further pleading or other document submitted for consideration by this Court. He shall include with the original paper to be filed with the Clerk of

the Court a certificate stating the date that a true and correct copy of any document was mailed to defendant or his counsel.  Any paper received by a district judge or magistrate judge which has not been filed with the Clerk or which fails to include a certificate of service will be disregarded by the Court.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the complaint, and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this cause is **REFERRED** to a United States Magistrate Judge for further pre-trial proceedings.

Further, this entire matter is hereby **REFERRED** to a United States Magistrate Judge for disposition, as contemplated by Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *should all the parties consent to such a referral.*

Plaintiff is **ADVISED** of his continuing obligation to keep the Clerk [and each opposing party] informed of any change in his whereabouts during the pendency of this action.  This notification shall be done in writing and not later than seven (7) days after a transfer or other change in address occurs.  Failure to provide such notice may result in dismissal of this action.  *See* FED.R.CIV.P. 41(b).

**IT IS SO ORDERED.**

**DATED this 2nd day of June, 2010.**

                                            **s/ Michael J. Reagan**
                                            **MICHAEL J. REAGAN**
                                            **United States District Judge**